## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | | |
|---|---|---|
| **EDNA G. PRIMAS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **5:04CV342 (DF)** |
| | : | |
| **BOARD OF REGENTS OF THE** | : | |
| **UNIVERSITY SYSTEM OF** | : | |
| **GEORGIA,** | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R

Plaintiff Edna G. Primas has sued Defendant Board of Regents of the University System of Georgia, alleging claims for employment discrimination based on her race and gender under 42 U.S.C.A §§ 1981 & 1983 (West 2003) and under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* (West 2003).  Currently before the Court is Defendant's Motion for Summary Judgment (doc. 16).  For the following reasons, Defendant's motion is hereby granted.

## I.  BACKGROUND

Defendant Board of Regents of the University System of Georgia ("Board") manages and controls the Medical College of Georgia, which in turn operates an entity called Georgia Correctional Healthcare ("GCHC").  GCHC, under a contract with the Georgia Department of Corrections ("GDC"), provides medical services to Georgia

prisoners.  Plaintiff Edna Primas, a black female, was employed by GCHC at Pulaski State Prison ("Pulaski State") in Hawkinsville, Georgia, from August 12, 2002 until her termination on December 18, 2003.

Apart from recognizing each other as parties to the lawsuit, there is very little in this case about which Primas and the Board can agree.  While the parties generally agree that the work environment in the medical unit at Pulaski State was tumultuous during Primas's tenure there, they disagree as to the cause — Primas insists that the medical unit was rife with racial antagonism, while the Board maintains that an internal personnel shakeup and Primas's lack of interpersonal and management skills were to blame.  With respect to the manner in which Primas was received and treated by her co-workers and supervisors, the parties have painted two very different pictures.  Because the Board has moved for summary judgment, however, the Court views the evidence in the light most favorable to Primas, drawing all reasonable inferences and resolving all ambiguities in her favor.  *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 (11th Cir. 2002) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742-43 (11th Cir. 1996)).

GCHC hired Primas to serve as the Health Services Administrator ("HSA") at Pulaski State in August 2002.  An HSA is the day-to-day manager of the prison's medical unit.  In that capacity, Primas was responsible for ensuring that the prisoners' medical needs were met effectively and efficiently.  In addition to working closely with the physicians at the prison, HSA's are charged with making sure that all GCHC and GDC

2

policies and procedures are carried out as intended.  HSA's are also responsible for paying bills, ordering supplies, responding to prisoner grievances, and overseeing employee payroll.  As they would of any other employee occupying a leadership position at Pulaski State, Primas's superiors expected her to establish and maintain a professional rapport with her colleagues and to communicate effectively with them.

When Primas took over management of Pulaski State's medical unit, its daily functioning was in disarray.  At the time it was considered by GCHC management to be a "troubled site."  This designation was due in no small part to the recent retirement of the Medical Director and the imminent departure of the Director of Nursing.  Turnover within the unit hampered its operations and left it with a destabilized leadership structure.  Primas was hired to remedy many of the existing problems and generally to help turn the unit around.

Primas was hired by and worked under the immediate supervision of Page Fletcher, GCHC's Southwest Regional Manager.  As a regional manager, Fletcher is responsible for overseeing the operation of sixteen medical units at various GDC correctional facilities.  Fletcher introduced Primas to her new job responsibilities from her first day on the job.  He familiarized her with various GCHC and GDC manuals and policy guidelines.  He did not spend time covering orientation materials relating to basic GDC procedures because he assumed that she had become familiar with those procedures during her stint as a nurse at Baldwin State Prison, where she worked before

3

coming to Pulaski State.  In fact, Primas's experience in the prison setting was one of the things Fletcher found appealing about her when he was considering HSA candidates for Pulaski State.

After giving her the initial overview, Fletcher arranged for various of Primas's HSA counterparts from other prisons to provide her with more particularized and comprehensive training.  Fletcher believed this would be an effective method of training because it would allow Primas to learn her new responsibilities from those who knew the job best.  She received ongoing instruction from the following HSA's: Gail Spikes (Macon State Prison); Tonya Kemp (Dodge State Prison); David Woodard (Wilcox State Prison); and Frank Basile (Dooley State Prison).

For a period of several months shortly after Primas began, Frankie Gainous, the regional coordinator in charge of overseeing the clinical services at Pulaski State, served as her acting supervisor while Fletcher was out of work recuperating from heart surgery.  Almost immediately, Gainous saw signs that Primas was not carrying out her job responsibilities as expected.  For instance, in October 2002, Gainous observed a large stack of unpaid bills (totaling approximately $700,000) in plain view on the desk of Primas's assistant, Cody Blackman.  Primas had been instructed during orientation that her job duties included ensuring that the bills submitted to the medical unit were paid.  Primas maintained at the time that Blackman had hidden the bills from her and that, in any event, she was not responsible for paying these particular bills.  Nevertheless,

4

because Blackman was under Primas's direct supervision and because paying the bills is one of the HSA's most important functions, Gainous was troubled by this episode.

In the fall of 2002, Frank Basile, the HSA at Dooly State Prison — and one of the ones chosen by Fletcher to help train Primas — began traveling to Pulaski State once a week to train Primas and to make sure she was getting the hang of her new job. Basile continued to make weekly trips to the prison for nearly two months. On his first trip, Basile ran into a troubling site. He saw a substantial stack (approximately one foot high) of inmate concern letters that had not been logged in or responded to, both tasks for which the HSA was responsible. Many of the letters had been received before Primas began her job. In any event, Basile, alarmed by the volume of unlogged letters, advised Primas to focus her attention on reducing the stack of letters because GDC and GCHC policies required that each letter be logged in on the day of receipt and that each one be responded to within 30 days of its arrival.

Fletcher returned to work from his medical leave in November 2002, and soon thereafter received a briefing from Gainous, CGHC's Director of Patient Care (and Gainous's supervisor) Lynn Bill, and GCHC's Director of Field Operations (and Fletcher's immediate supervisor) Nick Munhofen regarding the status of each of his medical units. All three expressed doubts about Primas's ability to make an effective HSA. Bill, who had by that point learned that Primas was having difficulties grasping the administrative requirements of the job and that her personality was causing tension

in the prison, recommended terminating Primas while she was still on probationary status. Bill conceded, however, that her own expertise was in clinical, not administrative, matters and agreed to defer to Fletcher's decision about Primas's continued employment.

Because he had hired Primas before undergoing surgery and therefore had not been able to personally interact with her while on medical leave, Fletcher was not persuaded that Primas should be terminated. Instead, he wanted a sufficient opportunity to work with her one-on-one to help her overcome her difficulties and master the job. Fletcher worked closely with Primas in the months following the meeting with Gainous, Bill, and Munhofen. Although Fletcher acknowledged that some of the upheaval in the medical unit was beyond Primas's control (e.g. the deficient performance of the prison's medical director and the vacancy created by the abrupt departure of the prison's director of nursing), he remained puzzled by the fact that she continued to seem overwhelmed by her responsibilities. Primas explained to him that she had been distracted by various health problems and by issues in her personal life. Fletcher kept working closely with her to remedy the problems in the medical unit.

Primas's first performance review came in April 2003. Notwithstanding the concerns expressed by Gainous, Bill, and Munhofen, Fletcher wrote a generally positive review of Primas and her potential to manage one of the most challenging facilities in the region. He qualified his assessment, however, by noting that her performance could be improved with "management training" and that she needed to work on honing her

"interpersonal skills."  It was Fletcher's belief that Primas was not a "people person," and he knew that some, though not all, among her staff viewed her as unhelpful and unapproachable.  Primas agreed to work on her people skills, but over time Fletcher did not see much improvement in these areas.

During the winter and spring of 2003, some white staff members in the medical unit started to suspect that Primas was treating black staff members more favorably; for example, by exempting black employees from having to work the less-appealing weekend shifts.  Primas and other black staff members became equally suspicious of the motives of their white colleagues, insisting, for example, that the white staff members acted with racial animus by not inviting their black co-workers to an off-site Christmas party.  Primas reported to her superiors that "racial tensions" in the unit were mounting, but she did not specifically complain to Fletcher that she had been discriminated against.

In May 2003, one of Primas's black colleagues, Juanita Jefferson, filed an internal charge of discrimination, which Fletcher investigated at the request of GCHC's human resources department and the Medical College of Georgia's EEO Officer.  Jefferson complained that her white colleagues were not friendly to her because they thought she was Primas's favorite.  Meetings were held on May 20 and May 26 with the entire prison staff, during which Fletcher (on May 20) and GDC official Herman Johnson (on May 26) encouraged the staff to behave more professionally toward one another and warned them that harassment and discrimination would not be tolerated.

The medical unit continued to experience vacancies, and its overall condition continued to worsen. A director of nursing, Debra Singletary, was finally hired in August 2003, after a nearly year-long vacancy in that position, signaling what Fletcher hoped would be a turning point in the performance and productivity of the medical unit. It was not. Almost immediately, Fletcher observed that Primas and Singletary did not get along. Fletcher noted that Primas did not share information with Singletary, did not meet with her to discuss the way their work would be divided, and did not embrace Singletary as part of the prison's medical team.

Things within the unit came to a head in September 2003. After a confrontational telephone exchange among Primas, Deputy Warden of Care and Treatment Victoria Malone, and a physician's assistant named Rick Lauderdale involving a mixup in an inmate's discharge treatment, Fletcher called Primas to his office on September 19 for a face-to-face meeting to discuss a number of issues within the medical unit — issues which, according to Fletcher, had reached a "crisis point." Fletcher discussed with Primas her discourteous behavior toward GCHC employees and facility administration, her ineffective leadership style, her failure to render productive service, and her inability to delegate tasks.

Shortly after this meeting, on September 26, Primas wrote Nick Munhofen a letter accusing Fletcher of race and gender discrimination, alleging, among other things, that he failed to look into her complaints about the use of racial epithets by employees in the

medical unit and that he had told her she was hiring too many blacks. Primas alleged that Fletcher treated her differently than her white colleagues and that his behavior contributed to the creation of a hostile work environment.[1] Primas also filed a charge of discrimination with the Medical College of Georgia's Affirmative Action Office, which launched its own investigation into the matter. While that investigation was being conducted, Munhofen decided to reassign Fletcher and Gainous from supervising the medical unit. MCG's internal investigation turned up no evidence of discrimination.

Realizing that the clinical conditions at Pulaski State were deteriorating rapidly, Lynn Bill, in November, directed Gainous to conduct an internal audit of the medical unit. The unit failed the audit in nearly every category. Gainous communicated the results to Pulaski State's new warden, Guy Hickman, who in turn reported the audit failure to GDC Director of Health Services Bill Kissell. Based on the poor performance, GDC decided to conduct a formal audit in early December. Again, the medical unit fared very poorly. The results of these audits confirmed that the medical unit was in serious trouble, and GCHC began to come under pressure from GDC to take whatever measures necessary to improve the situation at Pulaski State.

Nick Munhofen, in consultation with Robert Bradford (GCHC Director) and Danny Finn (MCG Human Resources Director), determined that Primas, as the

---

[1] These allegations will be discussed in further detail below.

individual responsible for the day-to-day performance of the medical unit, should either be demoted and transferred to another prison or terminated. Fletcher, who had been reassigned from supervising the medical unit in November, played no role in the decisions regarding Primas's employment status. Munhofen wrote a letter to Primas soon after the GDC audit outlining his proposal. Primas refused to accept a demotion and transfer, so Munhofen terminated her on December 18, 2003.

Primas filed this lawsuit on October 12, 2004.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence. *See Anderson*, 477 U.S. at 249. Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

10

# III.  DISCUSSION

A.     *Discrimination Claims Against a State Under 42 U.S.C.A. §§ 1981 & 1983*

Defendant Board of Regents is an agency of the State of Georgia.  *See Wilson v. Bd. of Regents of Univ. Sys. of Ga.*, 262 Ga. 413, 414 (1992).  As such, it is immune from suit in federal court under the Eleventh Amendment to the United States Constitution unless (1) Congress has clearly and unequivocally abrogated the State's sovereign immunity by a statute validly enacted pursuant to § 5 of the Fourteenth Amendment, or (2) the State has, by some action, waived its sovereign immunity.  *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985).  There is no assertion in this case that the State of Georgia has waived its immunity from suit with respect to Primas's claims under §§ 1981 & 1983.  And Congress did not abrogate its sovereign immunity when it enacted these statutes.  *See Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1068 (5th Cir. 1981) (§ 1981);[2] *see also Freeman v. Mich. Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987) (§ 1981); *Quern v. Jordan*, 440 U.S. 332, 341 (1979) (§ 1983).  Thus, the State's sovereign immunity remains intact, and the Board may not be sued in federal court for alleged violations of either § 1981 or § 1983.  The Court hereby grants summary judgment in favor of the Board on these claims.[3]

---

[2]  The Eleventh Circuit has adopted as binding precedent all decisions issued by the former Fifth Circuit prior to October 1, 1981.  *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[3]  Eleventh Amendment immunity notwithstanding, Primas's § 1981 claim would be subject to dismissal in any event, as it is necessarily subsumed within her § 1983 discrimination claim against the

B.     *Discrimination Claims Under Title VII*

1.     *Hostile Work Environment*

Primas alleges that she was subjected to a hostile work environment at Pulaski

State on account of her race and gender.[4]  To establish Title VII liability against an

employer for maintaining a hostile work environment, a plaintiff must show that her

"workplace is permeated with discriminatory intimidation, ridicule, and insult that is

sufficiently severe and pervasive to alter the terms and conditions of [her] employment

and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

21 (1993).  A plaintiff does so by proving five essential elements: (1) that she belongs to

a protected group; (2) that she has been subject to unwelcome harassment; (3) that the

harassment was based on a protected characteristic of the employee; (4) that the

harassment was sufficiently severe or pervasive to alter the terms and conditions of

employment and create a discriminatorily abusive working environment; and (5) that

the employer is responsible for such environment under either a theory of vicarious or

direct liability.  *See Miller v. Kenworth Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The first three elements are not in dispute.  Primas is a member of a protected

---

Board. *See Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991) (citing *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 735 (1989)).

   [4] Primas has offered no evidence of gender discrimination, and to the extent that she still pursues any gender-based discrimination claims under Title VII (whether under a theory of hostile environment or disparate treatment), those claims are dismissed, and summary judgment is hereby granted in favor of the Board.

group, she did not want the harassment she claims to have experienced, and the Board concedes for purposes of this motion that the behavior to which Primas objects was based on her race. The Board argues that Primas cannot satisfy the fourth and fifth elements. After a thorough review of the record, the Court concludes that Primas has not produced evidence sufficient to create a genuine issue of material fact regarding the severity and pervasiveness of the alleged conduct. The Board is therefore entitled to summary judgment on Primas's hostile-environment claim. Accordingly, the Court does not address the Board's liability.

a.      *Severe or Pervasive*

"To be actionable under Title VII, a hostile work environment must be both 'objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so.'" *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1247 (11th Cir. 2004) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). The Board does not dispute the fact that Primas subjectively interpreted the behavior of Fletcher and her colleagues to be racially offensive. Rather, the Board argues that a reasonable person would not have found her working conditions to have been hostile and abusive.

"In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere

13

utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." *Hulsey*, 367 F.3d at 1247-48 (citing *Faragher*, 524 U.S. at 787-88). Proof of each factor is not required in order to justify a finding that the objectionable conduct is severe and pervasive enough to violate Title VII; rather, the Court must consider the totality of the circumstances. *Id*. at 1248 (citing *Miller*, 277 F.3d at 1276).

To support her contention that Pulaski State was "the most offensive and hostile of working environments" and that there exists in the record "abundant evidence of pervasive racial and gender harassment," Pl.'s Br. Opp'n Summ. J., doc. 20, at 5, Primas points to a handful of occurrences, which, she argues, were severe and pervasive enough to constitute a discriminatorily abusive working environment: (1) upon hearing of Primas's hiring, a white nurse named Carolyn Martin remarked in earshot of Primas, "I can't believe they had to hire a nigger" (Pl.'s Dec. ¶1); (2) at a conference in September 2003 Fletcher told Primas she was hiring too many black people; (3) one of Primas's colleagues overheard physician's assistant Rick Lauderdale refer to Primas as a "fat black nigger"[5]; (4) Fletcher told Primas he did not like braided hair and that "black women can do a lot of things with their hair that white women couldn't" (Pl.'s Dep., p. 249:12, 16-17); and (5) Fletcher corrected Primas's grammar on one occasion, saying that "you black people don't know how to say the word 'ask,' you're always saying 'as' instead

---

[5] This statement was not made to Primas and was not made in her presence.

of 'ask'" (Pl.'s Dep., p. 249: 21-23).

These are the facts Primas contends demonstrate the existence of a racially hostile working environment.[6]   Taken as true at the summary-judgment stage of the proceedings, and assuming that each instance could be proven at trial, this evidence is insufficient as a matter of law to permit recovery under Title VII on a theory of hostile-environment discrimination — the conduct alleged is neither severe enough nor pervasive enough under the controlling case law.

First, these comments were episodic. Primas was employed at Pulaski State for roughly 17 months. The five instances of objectionable conduct she relies upon to support her hostile-environment claim happened sporadically and with far less regularity than any behavior the Eleventh Circuit has found sufficient to create triable issues of fact on the question of objective severity and pervasiveness. *See Hulsey*, 367 F.3d at 1248 (reversing grant of summary judgment where defendant's harassing behavior occurred "at least 18 times during [] approximately 2 to 2-1/2 weeks" and where plaintiff's term of employment lasted only five weeks); *see also Johnson*, 234 F.3d at 509 (plaintiff demonstrated "roughly fifteen separate instances of harassment over the course of four months").

Second, the circumstances under which the comments were made make it difficult

---

[6]   In addition, Primas makes a number of conclusory assertions about racial hostility at the prison for which she has shown no evidentiary support.

to characterize them as objectively severe.  The two arguably worst comments — those made by Martin and Lauderdale — were not even spoken to Primas.  She indirectly overheard Martin's comment, and she learned of Lauderdale's comment secondhand from one of her co-workers, Mary Alice Dennis, who heard it spoken.  The remaining three statements, while offensive to Primas, are simply insufficient to show the sort of severity indicative of a hostile work environment.

Third, none of these statements is physically threatening.  They are more akin to offensive utterances.  While there can be no doubt but that "nigger" is a vulgar, demeaning, and humiliating word — the use of which remains an unfortunate reality in the twenty-first century workplace — it has long been the law in this Circuit (and others) that "[t]he mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the terms, conditions, or privileges of employment to a sufficiently significant degree to violate Title VII."  *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (internal quotation marks omitted); *see also Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005) (holding statements such as "that damn nigger," "damn black," "nigger s**t, radio," "nigger-rigging," and "f***ing nigger," some of which, as here, were not directed at the plaintiff, insufficient to permit inference of hostile working environment); *but see Ross v. Douglas County, Neb.*, 234 F.3d 391, 396-97 (8th Cir. 2000) (recognizing as "sufficient showing" evidence that an employee endured "a stream of racial slurs directed toward him")

16

(citations omitted); *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (affirming trial court finding of severe and pervasive discrimination where plaintiff was target of "repeated," "continuous," and "prolonged" racial slurs). Primas was not subjected to a constant barrage of racial epithets. With regard to the single racial slur she did hear firsthand, there is no evidence that she was even intended to hear it.

And finally, there is no evidence from which a reasonable jury could conclude that these statements interfered with Primas's ability to do her work. Primas repeatedly asserts in her submissions to the Court that her "authority was undermined" by her co-workers, that "Fletcher constantly usurped [her] authority," and that everyone at Pulaski State "set her up for failure." (Pl.'s Stmt. Disp. Mat. Facts, doc. 21, ¶ 6.) But these conclusory assertions are not supported by evidence of racially discriminatory treatment. That is, Primas has failed to identify any facts, beyond the remarks outlined above, that would support these suspicions. The Court concludes that the remarks previously discussed are insufficient to show that Primas's work performance was unreasonably interfered with.

For these reasons, Primas's hostile-environment claim fails, and the Court grants summary judgment in favor of the Board.

2.    *Disparate Treatment*

Arguing that she was not treated the same as her white co-workers, Primas seeks to establish Title VII liability against the Board using a disparate-treatment theory of recovery.  Liability based on disparate treatment may be established using either direct or circumstantial evidence of discrimination.  To support her disparate-treatment claim, Primas appears in her brief to rely on the same statements outlined above, in addition to the allegations in her complaint that she was inadequately trained for the job and that her authority was constantly undermined by Fletcher and her co-workers.  She asserts that the statements, the inadequate training, and the alleged mistreatment by her co-workers all constitute direct evidence of the Board's discrimination.  The Court disagrees.  If believed, neither the statements nor the training nor the treatment, viewed individually or collectively, would establish a fact in issue without relying on inference or presumption.  *See Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1104 (11th Cir. 2001).  The Court thus views Primas's evidence as circumstantial only.  Accordingly, her claim is governed by the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and refined in *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

Under this framework, Primas must first establish a prima facie case of intentional discrimination, which for recovery under a theory of disparate treatment requires her to show that: (1) she is a member of a protected class; (2) she was subjected to an adverse

18

employment action; (3) her employer treated similarly situated employees outside of her class more favorably than it treated her; and (4) she was qualified to do the job. *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000); *see also Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  If she can establish each of the prima facie elements, an inference of discrimination is created.

The burden then shifts to the Board to rebut the inference of discrimination by proffering one or more legitimate, non-discriminatory reasons to explain the adverse employment action taken against Primas.

Once the Board articulates one or more legitimate, non-discriminatory reasons for its action, the burden once again shifts back to Primas to show that the Board's proffered reasons are pretextual — that is, "that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 256.  Because the burden of persuasion remains at all times on Primas, the burden of discrediting the Board's proffered reason "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id*.

The Board argues that Primas has not produced evidence sufficient to create a genuine issue of material fact with respect to the third element of her prima facie case — that a non-black employee, similarly situated in all relevant respects, was treated more favorably than she was.  The Court agrees.

19

In her complaint, Primas alleges that she was "continuously subjected to disparate treatment" when Fletcher "refus[ed] to allow her to receive the training granted to white employees." (Compl. ¶ 7, doc. 1).  To establish the third element of her prima facie case Primas must do two things: First, she must identify a comparator outside of her protected class who is "similarly situated in all relevant respects."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).  Second, she must come forward with evidence that her chosen comparator was in fact treated more favorably than she was.  Primas has done neither.

Primas singles out Debra Singletary as a white employee who received more extensive training than she did.  But Singletary's job training is beside the point because Primas and Singletary were not similarly situated in all relevant respects.  They did not hold the same job position.  Primas was an HSA and Singletary was a Director of Nursing.  The job duties required by these positions are sufficiently dissimilar to render any comparison between Primas's training and Singletary's training legally irrelevant under Title VII.  Additionally, with respect to other HSA's throughout the prison system, who might have been chosen as comparators (but were not), Primas testified in her deposition that she was unaware of the training other HSA's received.  (Pl.'s Dep., p. 224:22,25; 227:3-4).  Thus she has presented no evidence to support the assertion that she was denied adequate training on account of her race.  These deficiencies are fatal to Primas's disparate-treatment claim, and the Court therefore grants summary judgment in favor of the Board.

*3.    Retaliation*

Primas alleges that the Board "retaliated unlawfully against [her] for seeking to protect her statutorily protected rights." (Compl. ¶ 35, doc. 1).

To establish a prima facie case of retaliation under Title VII, Primas must demonstrate that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *See Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 580 (5th Cir. Unit B 1981); *see also Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006). If she is able to establish all three elements, an inference of discrimination is created, and the burden then shifts to the Board to offer one or more legitimate, non-discriminatory reasons for subjecting her to an adverse employment action. Should the Board be able to articulate a legitimate, non-discriminatory reason for its employment action, the burden will shift back to Primas to demonstrate that the Board's reason is pretextual. *See Hairston v. Gaineville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) ("The burden of proof in Title VII retaliation cases is governed by the framework established in *McDonnell-Douglas* [*v. Green*, 411 U.S. 792, 793 (1973)]).

Primas argues that she engaged in statutorily protected activity when she reported to her superiors conduct she perceived to be race discrimination prohibited by Title VII. Primas made the following reports: (1) In November 2002, shortly after Fletcher

21

returned to work after his surgery, Primas told him that she had overheard Carolyn Martin say, "I don't know why they had to hire a nigger"; (2) During April and May 2003 Primas told Fletcher that she had "received complaints regarding racial discrimination from Juanita Jefferson," one of Primas's black co-workers; (3) In May 2003 Primas contacted Danny Winn, the Human Resources Director at the Medical College of Georgia, and told him about "my concerns of racial tension"; (4) Also in May 2003 Primas met with Warden Rose Williams and Deputy Warden Victoria Malone to discuss "the racial tensions on the unit." Primas followed up the meeting with a letter to Williams, Malone, and Winn stating that some black nurses were upset because they were getting jobs they did not want, that one black nurse felt uncomfortable because a white employee "would sit and stare at her," and that a black nurse felt that the white nurses were not communicating information to her that was pertinent to her job; (5) At some undisclosed time, Primas told Gainous and Fletcher that a black agency nurse had filed a sexual harassment charge against David Woodard, a white male administrator; and (6) On September 26, 2003, Primas wrote a letter to Nick Munhofen, GCHC's Director of Field Operations (and Fletcher's immediate supervisor), which served as her internal complaint of discrimination and recounted all of the conduct discussed above, which, in her view, created a hostile work environment in the medical unit. After voicing her concerns, Primas continued to work at Pulaski State until her termination on December 18, 2003.

22

Primas was subjected to an adverse employment action: she was terminated.  And for purposes of this motion, the Court will assume that her actions constitute statutorily protected activity, though it is less than clear that they do.[7]  A thorough review of the evidence, however, reveals that Primas cannot establish the third element of her prima facie case — that is, that her termination was causally related to her opposition.

      *a.*    *Causal Relationship Between Protected Activity and Adverse Action*

Primas last complained to her superiors about discrimination at Pulaski State in late September 2003 when she wrote a letter to Nick Munhofen, outlining the reasons

---

[7] To establish that she engaged in a statutorily protected activity, a plaintiff "must show that she had a good faith, *reasonable* belief that the employer was engaged in unlawful employment practices." *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (emphasis added) (internal quotation marks omitted); *see also Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (plaintiff's belief about allegedly unlawful employment practices must be "*objectively* reasonable in light of the *facts and record presented*").  Although the Court assumes for present purposes that Primas engaged in statutorily protected activity, it is rather doubtful that the complaints she lodged with her superiors can be construed as having been made in opposition to conduct that a reasonable person would believe to be prohibited by Title VII.  The complaints Primas made consisted of several unspecified reports of "racial tensions" at the prison, a couple of unspecified reports of harassment allegations, and, in large part, the very same conduct she relied upon to support her hostile-environment claim.  To establish that her complaints qualify as protected "opposition" under Title VII's anti-retaliation provision, Primas need not prove that the underlying conduct actually violated Title VII. *Weeks*, 291 F.3d at 1311.  It is sufficient if her belief in the unlawfulness of the underlying conduct was objectively reasonable "in light of the facts and record presented." *Little*, 130 F.3d at 960.

In this case, because Primas's complaints to her superiors were based primarily on the same conduct she alleged created a hostile work environment, and because the Court has concluded "in light of the facts and record presented" that a reasonable person would not have believed that such conduct created a hostile work environment, it would seem to follow that her belief that she was voicing opposition to unlawful conduct — however sincerely held — should be considered equally unreasonable.  *See Clover v. Total Sys. Serv., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) ("The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. . . . [The plaintiff's] belief that the conduct she described created a sexually hostile environment was objectively unreasonable. Therefore, she did not engage in statutorily protected conduct under the opposition clause.").

she believed she was being subjected to a hostile work environment. Primas then continued to work at the prison until she was terminated on December 18, 2003 — nearly three months later — in the wake of two failed audits of her medical unit.

While temporal proximity is not necessarily the determinative factor in the causal-connection inquiry, it is certainly a probative one. Close temporal proximity between a plaintiff's opposition to a perceived Title VII violation and her subsequent termination does not, standing alone, conclusively establish the causal connection necessary to sustain a retaliation claim under the statute, though close proximity may provide a link in the evidentiary chain leading to a reasonable inference of discriminatory retaliation. Attenuated temporal proximity likewise will not always conclusively demonstrate a lack of causation, particularly where other evidence has been offered by the plaintiff tending to suggest a causal relationship between her opposition and her termination. But where there is an attenuated temporal proximity between the opposition and the termination (as here), and no other evidence is presented to show that the two events are causally related (as here), the plaintiff cannot make out a prima facie case of retaliation under Title VII.

In this case, Primas has shown only that she complained about perceived discrimination and that she was later terminated. She has not presented evidence tending to link her termination to the complaints she made to her supervisors. Included among Primas's list of material "facts" about which she contends there are genuine

24

issues to be resolved at trial is the following: "Fletcher and other white staff and supervisors notched up the hostility to retaliation, including termination, once Ms. Primas complained of the illegal discriminatory behavior that led to her unjust termination." (Pl.'s Stmt. Facts, doc. 21, ¶ 21). She further states as a "fact" that the "racial slurs, disparate treatment, and Ms. Primas's complaining about them . . . set[] the stage for Defendant to engineer her demise." (Id.) These are strong accusations. But they are conclusory and not supported by any evidence from which a reasonable jury could conclude that her complaints in April, May, and September ultimately had anything to with her termination in December — a termination that came only after the medical unit she was in charge of failed two audits.

In an e-mail communication sent from Nick Munhofen to Danny Finn in early December 2003, roughly one week before Primas was terminated, Munhofen proposed reassigning Primas to another correctional facility or terminating her if she would not voluntarily resign. He found this recommendation necessary because of "operational problems, such as . . . in my opinion a lack of effective leadership specifically with Edna [Primas]." Munhofen noted that "[m]y concern is further predicated upon my perception that Ms. Primas lacks sufficient skills necessary to create an environment of team spirit" and that she does not "communicate effectively with staff and external colleagues and supervisors." He summed up his view regarding Primas's capabilities by noting: "I do not believe that Edna has the leadership abilities to effectively take the medical unit from

25

its present condition to the level that it needs to be . . . in accordance with GDC expectations." (Def.'s Ex. B, Att. 4, doc. 16). In short, her employer determined that she was ill-equipped to handle the job she had been hired to do.

Because Primas has not produced any evidence to indicate that her termination was related to her earlier complaints about racial tension within the prison or about the alleged hostile work environment, she has failed to create a genuine issue of material fact on the third element of her prima facie case. Primas's retaliation claim therefore fails, and the Court grants summary judgment in favor of the Board.

## IV. CONCLUSION

The Court should point out before concluding that its task in considering this motion has been needlessly frustrated by the parties' inability to separate the wheat from the chaff in determining which facts are material to its resolution and which are not. This unfocused approach is best evidenced by the statements of fact submitted in conjunction with the Board's summary-judgment motion: the Board submitted a 45-page, 143-paragraph statement of facts; Primas responded with her own 46-page, 164-paragraph statement. Unfortunately, rather than culling from those filings the facts to which the law attaches significance and presenting them succinctly in their summary-judgment briefs, the parties simply incorporated into their briefs these sprawling submissions (effectively achieving an end-run around the 20-page limit imposed by this Court's Local Rule 7.4). Many of those incorporated "facts" are either legal conclusions

26

parading as fact or are immaterial to the legal issues raised in the case.  *See* U.S. Dist. Ct. M.D.Ga. Local R. 56 ("The movant for summary judgment . . . shall attach to the motion a . . . *concise* statement of the *material* facts to which the movant contends there is no genuine issue to be tried. . . . Statements [by either party] in the form of . . . *legal conclusions* (rather than material facts) *will not be considered by the court*.").  There is plenty to be said for thoroughness; but so too is there much to said for getting to the heart of the matter.

The Court has nevertheless thoroughly examined the evidence presented and concludes that Primas has failed to demonstrate a genuine issue of material fact on any of her claims and that the Board is entitled to judgment as a matter of law on all of them. Accordingly, Defendant's motion for summary judgment is hereby **GRANTED** (doc. 16).

SO ORDERED, this 30th day of March, 2006.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew